Case number 209-972, second case of the morning call. People of the State of Illinois v. Guillermo Guerrero. On behalf of the appellant, Mr. Shannon Lynch. On behalf of the appellee, Mr. Barry Jacobs. Gentlemen, as you may have noticed, Justice Burke and I are sitting here alone. Justice Bowman was unable to be here this morning, but he will be able to review our argument in its entirety through the audio recording of today's proceedings. You may proceed when you're ready, then. May it please the Court of Counsel. Does Mr. Guillermo Guerrero in this case, in my first two issues in my brief, describe the constitutional deprivations that occurred in this case? The two constitutional deprivations that occurred first is his ineffective assistance of right requiring the Constitution under the Sixth Amendment. The second being the Due Process Clause and what occurred with the admonishment given by the judge during his arraignment. The first one involves the fact that under the Sixth Amendment, his constitutional right to effective assistance of counsel includes his counsel properly admonishing him as to what the proper penalties are. In this particular case, it falls under Strickland, but we have to show the two different prongs. Just get to the prejudice. Absolutely, Judge. In the second prong of it, we have to show that there is prejudice that occurred in this situation. It most certainly did. The biggest decision that a defendant can make in proceeding in charges against him is whether or not to pursue negotiations with the state or to go to trial. That decision has to be made with the proper advice of counsel. Now, in counsel advising his client as to whether or not to seek negotiations or to go to trial, he needs to take into account two things. One is the risk involved in going to trial. The second thing that's involved is deciding what is the likelihood of success at trial. Counsel in this situation did not have the information to provide the first part of that analysis, of that balancing approach. As in Curry, it's not a situation where the attorney didn't just advise my client as to what the possible penalties are. He misadvised him. He told him that he was eligible for probation. This was also given to him by the court during arraignment. He was told not only that he was eligible for probation. Right. That's the first prong. Correct. We're with you there. Now, counsel, why and how is your client prejudiced? He has no right to enter into plea negotiations, and that's not a right. It's not a right to get an offer from the state. That's certainly correct. But I think that where counsel might misapply this as well is looking at plea negotiations as starting with an offer from the state. Plea negotiations does not start with an offer from the state. The decision counsel's duty to his client during plea negotiations starts with advising his client as to whether or not to engage in those negotiations, not necessarily from when the state makes an offer. Defense counsel can go to the state and make his own offer. He can seek and elicit an offer from the state. But before he does either one of those things, he better sit down with his client and has the duty to sit down with his client to make the decision about whether to pursue that further. That's where plea negotiations begin. Is the record clear in this case that there were absolutely no plea negotiations? The record is, I believe there's certainly nothing on the record that indicates an offer was made by the state. When Attorney Gill, who was the defendant's first attorney, was on the case, he was there at arraignment and a couple of the cases after that. He asked at one point in time for the court for continuance so that his client, Mr. Guillermo, could receive a pretrial sex offender evaluation. And what's the purpose of that? The purpose of that evaluation is to determine what the propensity is of the- I get that. I know that. But what is it used for in that local community? Is that a precursor to an overture for a plea? Do you have to have that report before the state will talk to you? What's the point? It's not required for the state to talk to you in that situation. However, depending on how your client does on that, it certainly shows the state when you're entering into negotiations, whether this is an isolated event or whether this person has an ongoing problem where he's likely to reoccur. I think that's important in this case, and it's a good question, because this was a situation where it was a family member who was there. It's very specific, detailed facts as to why this occurred, as opposed to a gentleman setting up in front of a school waiting for the next kid to come out. And so I think that the results of that evaluation certainly could have aided the defense if he was to- Could have or did? Could have. I mean, did he do well on the evaluation, or is he a- It doesn't appear that evaluation was ever done, at least there's no record of it. Shortly after that court date, on the very next court date, is where Attorney John Carroll filed his appearance. Mr. Gill never did file a motion of withdrawal, but he did not appear after that court date. On Mr. Carroll's first appearance in court, the matter was set down for jury trial that day. The very next court date was set for jury trial. There was no- Is there any evidence regarding what Carroll did regarding any plea negotiations? The evidence concerning what he did regarding plea negotiations comes from the defendant when he testified in the second motion for new trial. He testified that Mr. Carroll came to his house and they discussed what the possible sentencing was. He was told at that point in time that he was going to- that he could receive probation. He was told at that point in time that he could receive probation even after trial. And that because of his lack of criminal background, that it was a possibility. Mr. Guillermo said that at that point in time we decided to go to trial because of believing of this possibility. Had he known that he was facing multiple decades mandatory in prison, Mr. Guillermo testified that he would have sought negotiations with the state. So there isn't any evidence that Mr. Carroll ever went to the state and sought negotiations. Even if he went and asked, the prejudice prong here that the Supreme Court cases talk about is that where the state makes an offer and the defendant turns the offer down based on false or erroneous information, where or how do you hang your hat on that portion of the argument? In other words, where's any indication in this record that the state would have made an offer? Well, I think the Brown Court directly addresses that question. And if you were to just confine your analysis on just the facts of Curry, which are also very unique, it doesn't answer the question or case. I don't think it turns down the question I'm asking or the issue I raise in ours. It just doesn't address it. But Brown comes pretty closer to that. In the Brown situation, the state had made an offer that was an illegal offer. It couldn't have happened. In a sense, there wasn't really an offer made because that wasn't a possibility of one. The court in that case said that the defense isn't required to show prejudice because there was no real offer to accept or to reject in that situation. Just as in our case here, there was no offer to accept or reject. What the court in Brown specifically said, though, if I may, Your Honor, is that the counsel's ineffectiveness in not knowing the possible penalty alone itself was enough to undermine the outcome of the proceedings. And that's really the test of the second prong, getting to what Your Honor is saying as far as prejudice. Prejudice doesn't require him to show that there most certainly would have been an offer from the state or even that it would be accepted by the state. Brown specifically says that. It just says that there has to be the error rises to the level where it undermines the confidence in the outcome. Not even beyond a preponderance of the evidence that it would have been different. Just enough to undermine it. I tend to agree with you that Brown, you know, is the closest to this situation. But, I mean, you're aware of the fact that the Third District seems to have retracted from Brown and People v. Church where they said there was no prejudice, where the defendant is only speculating that had he been accurately advised, he might have attempted to negotiate a better deal. Well, in this situation, it wasn't a matter of him suggesting he would have. He most certainly testified that he would have. He would have what? He would have negotiated for a deal. And I think that if you look at the specifics of this particular case, as the court did in Curry, that this case was ripe for negotiations. The court in Curry looked at the defense aside and said he didn't have much of a defense here. It seems to me that negotiations would have been appropriate. If we look at the facts in this case, Judge DiMarzio, I'm sorry, I don't mean to interrupt you, Judge Gittins. But you keep sidestepping the issue. Where is any indication in this record? Not that your client would have asked for an offer, but that the state would have made an offer. That's exactly where I'm getting at. Okay. I think that if you look at the facts in this case, Judge DiMarzio, in finding guilty, rattled off a laundry list of problems with the state's case. In a sexual assault case where there's a minor, the state is always in a situation where they want to, if they can avoid it, resolve it without the client testifying. And in this case, the judge even said that it was a close call. In that situation, I think in the real world, if you look at it in common sense, that's a perfect example of where the state would have tried to negotiate here. But the appellate record is not the real world. I have to look at what's in the record, which sort of brings me to... Right. In the record is a laundry list of problems with the state's case. I think that if you look at where the state was at in terms of what evidence they had to go forward in this case, I think that if you looked at that, it would. As the Brown Court said, any time that you look at a Strickland case, there is always a degree of speculation. In that situation, they said that the defendant could have made a counteroffer to the state to lower it. Now, there's no guarantee that the state would have accepted it, Brown said, but there's always a degree of speculation in this. Strickland requires speculation on Your Honor on the second prong at all point in time. If the attorney in this case didn't call a witness, Your Honors would be speculating as to whether or not that witness would have made a difference at trial. I'm only asking that you speculate that had my client been given the proper information that he faced decades in custody, that you speculate that he would have made, as he testified, an overture to the state. But the remedy you're asking for is a new trial. Your client got a fair trial. He did get a fair trial. That's the remedy that is said by Curry. And what it says is that we can't just go down there and specifically enforce a plea. In this case, there wasn't even an offer to do that, and in Brown, it was an illegal offer. You can't do that. What you have to do to remedy it, the closest you can come to it, is to grant the person a new trial with the right to negotiate. There is no right to negotiate. No, but the ability to be able to negotiate, I guess, would be a better way of phrasing it, Your Honor. The reason why both of those are important is because if you just send them down there saying negotiate, and they don't have a right to a new trial, the defense is not in a position to bring anything to the table. The state has to have something to possibly lose in order to want to negotiate. If you didn't give them the right to a new trial, what does the defense have to negotiate with? Nothing. If they have a right to a trial, then they can enter negotiations to avoid the trial on behalf of the state and the defense to work out an agreement. I think that was the reasoning why it was sent down in both of those cases with the right to a new trial with the ability to negotiate. But in both of those cases, there had been an overture, albeit an illegal one in Brown. There had been an overture by the state to be willing to negotiate. How do I conclude that based on this record? I guess that's really the heart of the issue. How do I not know that you said, you know, you have to speculate a little. How do I not know that in these kind of cases, maybe it was the Kane County State's Attorney's Office says no offers. That's it. It's a family member, no offers. It's certainly a possibility. But the reason why there's speculation, and I'm asking you to make the speculation, is because that possibility does exist out there. And in the real world, and I realize the appellate court, but that's exactly how it does go. I'll give you an example, Judge, of the opposite. Say in this situation everything was exactly the same. Mr. Carroll didn't know what the law was and made an offer to the state of four years. And the state said no, we're not going to negotiate with you. Now, we still have the first prong satisfied. Mr. Carroll didn't know what the law was concerning it. He misadvised his client. But the second part of the speculation has ended. The state said no. We don't have that in this situation. We don't have the state saying what Your Honor is speculating they might do and say no. They didn't say no. That's why that's an open question as to what would happen. And just like in any Strickland case, that's why you do have to engage in a little bit of conjecture to see what would have happened. If the state had said to Mr. Carroll, we're not going to negotiate with you or reject his offer or anything like that, there wouldn't be any need for the speculation on your part. That was their decision. But in this situation, that was never raised. Mr. Guillermo was never put in a position to find out what the state would do because of the egregious errors by counsel. And, again, it's not a situation where he just wasn't told. He was misinformed, which led him to want to go to trial. He honestly believed that at the end of the day he would get probation after trial. And if Mr. Carroll had been right about the law or Judge DiMarzio had been right about the law, there's a good chance Mr. Carroll was right. The judge did indicate that he was considering probation for him and so forth. So I don't think that his admonition to his client was that far off base in terms of what would happen if the law was as he believed, but the law was not as he believed it to be. So we never get to that second stage, which does require some speculation on your part, as every Strickland case requires speculation on your part. Can I ask why did you not call Mr. Curry? I'm sorry, Mr. Carroll. Mr. Carroll. Mr. Carroll at the post-trial motion. Again, this is outside the record, but I did talk with Mr. Carroll. Mr. Carroll had a lapse in memory concerning what was actually said to Mr. Garamo. I thought that the record was very clear as to the first prong being satisfied. There was nothing Mr. Carroll could add to the second prong based on his ‑‑ So he had no recollection of whether he ever talked to the assistant. And I noticed this is the same assistant state's attorney throughout. It was. And it was the same state's attorney who also had the subpoena power to call Mr. Carroll as well if there was anything he had to say contrary to my claims. They certainly could have called him as well. It was the same state's attorney the whole ride. I wouldn't also note, since Your Honor brought that up, that it was the same state's attorney who stood there during arraignment when he was told that all the way through. And it was only brought out to my client at the end. Now, you know, lawyers and judges, we're human beings. We make mistakes. But when we do make those mistakes, the appropriate thing to do is to correct that. And there's no doubt that a mistake was made here by both court and his attorney. I don't think that there's much doubt that that mistake led him to his belief that he should take a trial in this particular case. The only speculation really is whether or not negotiations would have been successful. We don't know that. They didn't know in Curry whether negotiations would be successful. They didn't know it in Brown whether negotiations would be successful. And I don't know here whether negotiations would be successful or not. I tend to believe they will be, but I don't know that. It requires some speculation in all three cases to determine it. Of course, you raise good points, and this is different. There wasn't that offer made. But I think Brown does make clear that that speculation is exactly that, speculation. The facts do suggest that this is a case that would have been right for negotiations if the law had been known and Mr. Garamone did testify that if he had known he was facing two decades away from his family, as opposed to the likelihood of probation that he was told, that he would have engaged in negotiations. And I think Your Honors can consider that. I don't have a chance to reply. Thank you very much. I appreciate it. Counsel, do you wish to pose an argument? Good morning. I'm Barry Jacobs on behalf of the people. May it please the Court and counsel. In this case, this defendant, Guillermo Guerrero, was charged with seven felony offenses, and he faced pretty grave sentences on those. There's no dispute that he was admonished properly what the maximum penalty on these offenses would be, having four to 15 consecutive on those first five counts. So he was aware that he faced a grave penalty should he be found guilty of any of the Class I felony counts, certainly if he was found guilty of all of them. There's also no dispute that the defendant was incorrectly admonished at arraignment by Judge DiMarzio, saying he would consider 48 months' probation should he be convicted on the Class I felonies. There's also no dispute that at sentencing, and in fact the Court later found, that Defense Counsel Carroll believed probation was an option on these offenses. Turning to the defendant's claim of ineffective assistance of counsel, the crux of his claim is that he was unable to make a knowingly voluntary decision to exercise his right to trial. As I just stated, he knew he was facing, at the very, very minimum, on a single count four to 15 years, and he should have known that he faced, at the minimum, 20 years should he be convicted of all five of his counts. Well, counsel, that is kind of a stretch. I mean, I've read that arraignment transcript a couple of times. Defendant standing before Judge DiMarzio could easily, and I think clearly, walk away with the impression that he was eligible for probation. He may have had the impression, again, as I said on the record, in the case only that Judge DiMarzio said he was retiring and would not be sentencing the defendant. That's at the findings. I'm talking about the arraignment. Right. It was DiMarzio at the arraignment, DiMarzio at the findings, and it was Judge Spence later. Right. Judge Spence is the one that figures out both the state's attorney apparently- Yes, I misspoke. And Mr. Carroll were operating under an erroneous expectation of what the parameters were. Yes. Right? Okay. Yes, I misspoke. Turning to the prejudice prongs, and so it's where Your Honor's questions began, this case is controlled by Curry, and it's a people's position that Brown does not refute Curry in any way. As I indicated in my brief, in dicta, or what I believe is dicta, the third district spoke of a situation during plea negotiation, so they did preface that this was within the context of plea negotiation, and spoke of a situation where an unauthorized sentence was imposed and said that that did not determine whether or not there was, in fact, prejudice shown, or that should not be determined about prejudice. Curry is significant in that, in that case, defense counsel actually submitted an affidavit, and the court relied on that affidavit. The affidavit spoke of, based upon the advice given by counsel, the misadvice given by that counsel in Curry, the defendant chose to plead guilty. We don't have that in this case. There is no, what Curry terms, an independent objective corroboration. We have Attorney Gil, Attorney Gil who says, yes, he did represent the defendant. He couldn't accommodate the defendant. The defendant was adamant that he had done nothing wrong and didn't want negotiation. On this record, the only, and I mentioned it in my brief, the only indication we have that. Wait a minute. I think, wasn't Gil's testimony that the defendant was adamant that he was not guilty and wanted a trial? I don't think there's anything in the record, or if I'm mistaken, please point it out to me, where the defendant says he didn't want to enter into any plea negotiation. And I don't mean to split hairs, but I think there's a difference between saying, I don't want an agreement versus I want to go to trial. I wasn't, I wasn't attempting to quote it. I apologize if I did. He did say he didn't, it was an all or nothing, not that he said it was all or nothing, but he indicated that he had done nothing wrong. Right. And Attorney Gil testified that he had been overwhelmed by the discovery requests and the thorough investigation that the defendant wanted. So only, I would also say that the defendant, when he testified, said Attorney Gil didn't say, he didn't say either way anything about probation. So we don't have any misadvice by that first counsel, no record of it anyway. And we certainly have no independent objective corroboration as we did in Curry. That being an affidavit from Mr. Carroll or any kind of testimony from Mr. Carroll, that was his deficient advice that caused this defendant to forego negotiation. You know, if all we had was Curry, you know, I understand your argument, but we do have Brown. The issue is whether we take Brown perhaps a little further than it goes. But Brown does say that defense counsel couldn't have negotiated a reduction. And that's one of the, I don't know if you claim that's dicta or not, but they found prejudice because the defendant was misadmonished or misinformed, was extended an offer much less than what he actually got. The offer would have been illegal. But the court, in analyzing prejudice, did say that defense counsel, quote this, could have, unquote, negotiated a reduction. Why is that not the same here? That defense counsel could have negotiated a plea offer. As Your Honor indicated, the Third District has subsequently retracted that or backed off somewhat in church, saying that although he could have accurately, but he could have negotiated a better deal having accurately advised, they didn't find that was prejudice. So there has been a slight shift from the Third District. The overriding issue here is that there was simply no evidence of negotiation. It is complete speculation based on this record to say that the defendant would have sought negotiation. And although it's also speculation to say this, but at sentencing, the state actually asked for more time than the judge ultimately imposed in this case. So that may show that, I admit it's speculative, may show that the state wasn't interested in negotiating. It is unusual that there would be no negotiation in this case. I believe that that cuts against the defendant as much as it cuts for him. If the state would have asked for less time after trial than they would have asked for in a negotiation, I think I have a question about the state's attorney involved in that. No. Well, in that it shows that he would have, he had no interest in negotiation. That's, I mean, it cuts for and against. I'm sorry, could you repeat that? How did you get to a conclusion that that showed the defendant was not interested in negotiation? Because. Now I've forgotten what I said, but. Sorry. You're saying that the state's attorney wouldn't have been interested in negotiating or isn't that your point based on the. Well, based on the record. The fact that there was actually no, I'm speaking about the significance of absolutely no indication of negotiation when it does seem as Mr. Lynch argues in his brief. And in reply that, you know, in a real world situation, you would expect some sort of negotiation. In this case, I'm saying the fact that there is absolutely no indication that negotiation was sought or would have been engaged in by the, sought by the defendant or would have been engaged in by the state cuts against the defense argument as much as it favors this argument that he, and it shows that he was adamant. I mean, you can speculate that it also shows that he was adamant that he didn't. That negotiation wasn't going to be sought by the defendant. Can I ask you a question that's off what counsel argues? Please. Counsel also argues that there was no evidence or insufficient evidence on count five. The penetration count with the Q tip. Can you tell me how the record supports that? I mean, I realized that at one point in time, the victim testified to the words inside. But then it appears that upon further questioning to clarify that point, the state elicited information that it was not inside or even touching that it was around. She did indicate initially that the defendant used a Q tip to grab his sperm from inside her vagina. In subsequent questioning, she indicated that he had taken the Q tip and gone around her vagina and removed the liquid. The people's position is that that evidence considered together was sufficient to support the inference on that. The unreasonable doubt that he committed an act of penetration based on that testimony that he had gone inside her vagina. The only evidence in the record where sperm was located was outside the vagina. She had testified that he did ejaculate on the outside of her vagina. So how would she how would he obtain a sperm sample from inside her vagina when the only evidence was it was outside? Her testimony was both that it was outside and that he grabbed sperm from within. So the argument is our argument. Our argument is that a rational prior fact could have looked at that evidence and concluded beyond a reasonable doubt. That the defendant had committed an act of sexual penetration by from the testimony that he had removed sperm from her vagina and liquid from around. It's not entirely clear. And as I indicated in the briefer, certainly not as clear as an anatomical doll, which was suggested by defense counsel. Turning to the second due process violation argument, it seems that the defendant here hoped for a sympathetic judge. And he was not admittedly meticulously admonished at arraignment. And I may have misspoken earlier about what exactly was said. But it was an indication by Judge DiMarzio that a 48 month probation sentence could be possible. So it's clear that that was not meticulous admonishment. However, no meticulous admonishment is required at arraignment. Let me ask you this. Does the state have an obligation to correct the record? The state's attorney brings the charges. The state's attorney is standing there. Here's the judge misadmonish. Is there an obligation to correct the record? I think there could be an obligation. However, it's unclear if the state was aware of this. I mean, this was admittedly, when reading it, it appears a grave mistake. However, in the context of a wide arraignment, it's unclear if the state was aware of this being said or what import was given. But you are correct. The same assistant did handle this case from arraignment on through. Furthermore, when he was admonished, well, I think this is where we were in disagreement. When he was admonished, he did hear the wrong sentence. He did learn that Judge DiMarzio later would not be the person sentencing him, and Judge DiMarzio did say he would consider only probation. He never guaranteed it. So the defendant, with that information, should have been aware that he was facing considerable peril. Wasn't the horse out of the barn and pretty much in the next county by the time DiMarzio was making his findings following the trial? Well, certainly at that point, yes. But based on that one statement of arraignment, it's the state's position that that would not be enough to show that DiMarzio, Judge DiMarzio. Let me ask you this, counsel. Is it within the bounds of what we expect competent representation to be and competent participation by a state's attorney and the court that throughout this entire proceeding from arraignment through two attorneys, umpteen presentations in court, including findings after I'm being found guilty, that no one ever tells this man that he is going to be sentenced on counts one through five, he's found guilty or when he's found guilty, to mandatory consecutive Department of Corrections and that probation is off the table? Is that conscionable? It's not conscionable. However, I would indicate that at arraignment, he was correctly admonished about that maximum penalty and that it would be consecutive. But the minimum penalty is mandatory consecutive Department of Corrections. Nowhere at any place in this record has he ever told that. You're correct. How do we countenance that? Again, rule four or two applies in the context of guilty plea proceedings. There is no corresponding right to that type of admonishment at arraignment. Certainly it's a grave mistake. But it's a mistake. From your perspective, it's a mistake without consequence. It's a mistake that when we look at remedy, it's a difficult mistake to correct. The defendant doesn't allege that he wasn't given a fair trial in this case. So the remedy of a fair trial would not put him back in the position he was. Furthermore, if he does have the right to negotiate, there's no indication on this record that the state was willing at that time or would be willing in the future to negotiate. And it's questionable whether he would be able to, short of reducing all of the charges or dismissing those charges, the minimum penalty he would receive is the penalty that he got. Probation is not an option in this case. He couldn't go back and negotiate for probation on the charges as they stand. No, that's correct. I guess the point that we're making is that on the record there is no independent corroboration, objective corroboration that Curry speaks of to support the idea that there was any negotiation sought by the defendant or that the state would have engaged. We can speculate all day long about the state or what this evaluation meant from the defendant's perspective or what the state sought of sentencing. Those are all just speculative little items, but they don't really add anything to this record, which doesn't have any corroborative evidence that the defendant would have negotiated and would have pled guilty had he been able to negotiate. Thank you. Counsel, do you wish to reply? I stalled my thunder a little bit on the due process part. The due process requires that a person know what the charges are against him and what the possible penalties that he faces. And at no point in time from beginning to end did Mr. Garamo ever get told that by the court, by his own counsel, or corrected by the state's attorney. At no point in time did he ever know that he was facing multiple decades. That's not in a vacuum. I mean, if an individual appears before me in the trial court and I never admonish him about penalties, I never say a word to him about penalties, he doesn't waive any rights, goes to a full jury trial and I sentence him, he never knew. He can say, my attorney never told me, the court never told me, nobody ever told me. But I mean, this admonishment of rights is usually encompassed within the giving up of some constitutional rights. No, you're absolutely right. And if nobody had ever said anything to him, we'd be in a different situation. Unfortunately, both the court and his attorney told him wrong information. It went beyond not saying something to him. He was told by the very court in front of him, as well as his own counsel and in the earshot of the state's attorney, that you're eligible for probation. So it's not that they were silent. They told him wrong information. If due process requires anything, I would think it would require that the court not tell you the wrong sentence that you could get after you exercise your right to trial. And so it's a different situation than you ought to bring, which I agree, if that was the situation, but that's not the situation here. Your Honor raised in the counsel concerning the arounding, the vagina part. I'd like to address that. The exact testimony of the victim in this case was from my vagina, and then he grabbed some sperm that I had inside with me. And he wanted to see what the effect is. She doesn't say liquid. She says she grabbed some sperm. Twice in the testimony, we know that no sperm was ever inside her. One, from the fact that she said he ejaculated outside. And two, later in cross-examination, when the defense counsel is asking her, well, you knew you could get pregnant from having intercourse. She said, I didn't think I would because he didn't ejaculate inside me. So I think that on that count, and it's exactly why I raised it, there's absolutely a reasonable doubt as to whether or not there was any penetration at that point in time, based on her own testimony that he was getting sperm and the sperm was outside of her. We don't know exactly what around means. Your legs are around that area. Your stomach is around that area. So you just don't know, and that's what the unreasonable doubt is about. What should have occurred or could have occurred, or maybe the reason it didn't occur but it can't occur, is that the state could have brought a charge, draw a picture, point to the next, bring out a doll, point to exactly where he did this or how he did this. That was never done. That onus is on the state to prove that beyond a reasonable doubt. Which they did not do. The counsel made a lot of what Mr. Gill had said. Mr. Gill, if you read his testimony at the second motion of the trial, he spoke almost exclusively in what I normally tend to do. There was no, at any point in time, recollection as to a specific conversation where he could say when it took place, what was said, who was even present for it. It was all very speculative in terms of that, and he said he wanted an investigation. My office couldn't handle it. I passed it on, which I think is appropriate. His office really couldn't handle it. But there wasn't any testimony that he would not engage in plea negotiations. He didn't even have a memory of even discussing plea negotiations with him to determine whether or not he would. And the defendant's testimony is, I most certainly would have negotiated. I would have tried to work something out. Counsel tries to put the burden on my client of getting an affidavit from the very person who ill-advised him as to the sentencing and then have to come forward with an affidavit to say, I was wrong. Here's how I was wrong. Not only was I wrong, but you relied on me being wrong, and that's how you ended up being wrong. And that's quite an onus to put on the defendant in People v. Burke, which I cited to you guys as well. This very court on a post-conviction case, different scenario, different standards. But said, that's quite a burden to put on a defendant to have to come up with an affidavit from the very person who had ill-advised him that he relied on that. We don't have that here. He wouldn't do it. He couldn't do it. But the defendant testified clearly, I most certainly would have done that. Is that self-serving? Yeah, I guess in that situation. But any time that you say something that's positive towards yourself, it is self-serving. That doesn't make it necessarily not true. It doesn't make it necessarily not believable. Certainly all of the facts surrounding it back up everything else he said about what he was told, that he was told he was eligible for probation, that he would get it because of his background. All of his other testimonies corroborated in the record based on Mr. Carroll's response at sentencing, Mr. Carroll appearing to be surprised by what the sentence actually would be. So based on that, I don't think that the state's argument concerning what he was told by Mr. Gillibrand, the lack of the affidavit, means really much in this case. It just isn't available. Do I have any other questions? No. Thank you very much. I really appreciate the afternoon. Thank you.